IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

RUFUS BYERS,

      Plaintiff,

vs.                                        Case No. 15-24 MCA/SCY

FNU LNU, Bernalillo County Metropolitan
Detention Center Director, BERNALILLO COUNTY
BOARD OF COMMISSIONERS, RAMON C. RUSIN,
Chief of Corrections Department, TOM ZDUNEK, County
Manager, THOMAS E. SWISSTACK,

      Defendants.

**ORDER ADOPTING MAGISTRATE JUDGE'S PROPOSED FINDINGS AND
RECOMMENDED DISPOSITION**

      This matter is before the Court on Defendants' Motion for Summary Judgment on the

Basis of Plaintiff's Failure to Exhaust Administrative Remedies. *Doc. 7*. On June 11, 2015,

Magistrate Judge Steven C. Yarbrough entered a Proposed Findings and Recommended

Disposition ("PFRD") advising that the Court deny Defendants' Motion. *Doc.* 12. Judge

Yarbrough reasoned that summary judgment was inappropriate in this case because the factual

evidence does not unilaterally support Defendants' contention that Plaintiff failed to exhaust his

administrative remedies as required by the Prison Litigation Reform Act ("PLRA"). In Judge

Yarbrough's view, a material question of fact exists with regard to whether administrative

procedures were available to Plaintiff for grieving the issues raised in the complaint. Plaintiff did

not object to this proposed disposition. Defendants, however, filed timely objections reiterating

their position that the PLRA bars Plaintiff's claims because Plaintiff did not file any grievances

before filing the present lawsuit. *Doc. 13*. Having reviewed these objections de novo, the Court

agrees with the Magistrate Judge that Defendants are not entitled to summary judgment on the

issue of PLRA exhaustion. The Court will, therefore, adopt the PFRD and deny Defendants'
Motion for Summary Judgment.

I.       **Background**

A.  **Plaintiff's Claims**

This civil rights lawsuit arises out of a February 14, 2014 bus trip wherein Defendant
Bernalillo County Board of Commissioners transported Plaintiff, Rufus Byers, from the
Bernalillo County Metropolitan Detention Center ("MDC") to IAH Secure Adult Detention
Facility ("IAH") in Polk County, Texas. Plaintiff alleges that his constitutional rights were
violated during this trip because (1) he was transferred across state lines, (2) he was left in tight
handcuffs and not given any bathroom breaks during the twenty-hour trip, (3) he was illegally
strip-searched prior to the trip, and (4) he was prevented from contacting his family or counsel to
tell them where he was going. *Doc. 1*, Ex. A at 3-4. Defendants contend that all of these claims
are procedurally deficient because Plaintiff did not file any grievances regarding the bus trip
prior to bringing suit. *Doc. 4* at 12; *Doc. 7*.

B.  **Grievance Procedures at Plaintiff's Post-Incident Places of Incarceration**

Immediately prior to and at the time of the February 14, 2014 bus trip that forms the basis
of Plaintiff's complaint, Bernalillo County was holding Plaintiff, an MDC-detainee, on a
conviction for human trafficking and promoting prostitution. *Doc. 7*, Ex. A-C. On February 14,
2014, Bernalillo County transported Plaintiff to IAH as part of an effort to alleviate
overcrowding. *Doc. 7*, Ex. B. IAH then held Plaintiff, under contract with Bernalillo County,
from February 14, 2014 to March 13, 2014. *Id.* This transfer does not appear to have changed

Plaintiff's legal status as an MDC-detainee,[1] but it may have compromised his ability to file grievances with MDC regarding the bus trip or other matters.

Like most jails, MDC provides inmates with a detailed process for filing complaints about conditions of confinement. *Doc. 7*, Ex. E. Under this policy, MDC-detainees, such as Plaintiff, are "responsible for completing [their] grievance[s] using Request Manager," a program which is housed in a computer kiosk located within MDC. *Id.* at 1; *Doc. 7*, Ex. F ¶ 5-6. The policy further specifies that "grievable" issues "become non-grievable if a grievance is not submitted within 10 days of the alleged incident or situation." *Doc. 7*, Ex. E at 3. MDC does not, according to the terms of its written policy, allow for late filing of grievances or create any procedure for filing grievances other than use of the Request Manager. *See generally Doc. 7*, Ex. E. Because Plaintiff was at IAH from February 14, 2014 to March 13, 2014, Plaintiff did not have access to MDC's Request Manager in the ten-day period following this transfer; thus, he did not file any grievances directly with MDC during this period.

IAH's grievance procedures, which Plaintiff presumably enjoyed access to during this time, allowed detainees to file "formal written grievance[s] any time within fifteen (15) days after an incident has occurred." *Doc. 11*, Ex. L at 2.[2] IAH permitted grievances on the following subject matters: (1) "an alleged violation of civil, constitutional or statutory rights and policy," (2) criminal acts, (3) other prohibited staff misconduct, and (4) an unjust denial or restriction of inmate privileges. *Id.* Plaintiff did not make use of these procedures to file any grievances. *Doc. 11*, Ex. N.

---

[1] In his affidavit, Phil Quintana, the Social Services Coordinator for MDC refers to inmates, such as Plaintiff, who are transferred to other facilities as "MDC detainee[s] who [are] being housed or detained at a separate facility." *Doc. 7*, Ex. F ¶ 21.
[2] Emergency IAH grievances must be filed within 24 hours. Oral and informal IAH grievances must be filed within five days. *Id.* at 2-3

On March 13, 2014, Plaintiff was transferred to the Torrance County Detention Facility ("TCD"), another facility that contracted with Bernalillo County to house detainees in cases of overcrowding. *Doc. 7*, Ex. B. ¶¶ 5-6. The TCD grievance procedures limit the filing of grievances to disputes regarding facility conditions at TCD and other matters within the authority of Corrections Corporation of America, the TCD facility administrator. *Doc. 11*, Ex. Q. In accordance with this limitation, the TCD policy informs inmates that they may not file grievances to complain about "[c]ontracting agency . . . policies, procedures, decisions, or matters." *Id.* at 3-4. Plaintiff did not file any grievances under these provisions. *Doc. 11*, Ex. P.

On March 25, 2014, Plaintiff left TCD and returned to MDC for a short overnight period: March 25, 2014 to March 26, 2014, during which he did not file any grievances. *Doc. 7*, Ex. B. ¶¶ 4-7; *Doc. 11* Ex. F-H., *Doc. 11*, Ex. F-H. On March 25, 2014, Bernalillo County released Plaintiff into the custody of the New Mexico Department of Corrections ("DOC"). *Doc. 7*, Ex. B; *Doc. 13*, Ex. V. Like Corrections Corporation of America, DOC only permits the filing of grievances about matters within their control. Inmate Grievances CD-150500 at 7 (available at http://cd.nm.gov/policies/docs/CD-150500.pdf). Plaintiff has not made use of the DOC policy to file grievances about conditions at DOC facilities and has not attempted to make use of this procedure to retroactively file any grievances concerning the conduct of MDC staff. *Doc. 13*, Ex. V.

## C.  PFRD

In the PFRD, Judge Yarbrough considered the evidence summarized above and correctly outlined the legal standard – under the PLRA, prisoners are procedurally barred from bringing § 1983 actions with respect to prison conditions unless they have first exhausted "such administrative remedies as are available." *Doc. 12* at 4 (quoting 42 U.S.C. § 1997e(a)). After

evaluating Defendants' arguments regarding exhaustion, Judge Yarbrough concluded that Defendants had not carried their burden of showing, as a matter of law, that administrative procedures were available to Plaintiff, which he was required to, but did not exhaust. Judge Yarbrough based this conclusion on the following findings: (1) Plaintiff did not have an opportunity to file a grievance with MDC regarding the bus trip because he did not have access to the Request Manager in the ten-day period following the trip and only returned to MDC very briefly, (2) an unresolved question of fact remains about whether the IAH grievance procedures allowed prisoners to file complaints about conditions at other facilities, (3) TCD grievance procedures did not allow Plaintiff to file a complaint about the bus trip, and (4) Plaintiff was also barred from filing a grievance with the New Mexico Department of Corrections regarding the February 14, 2014 bus trip. The Court will, below, address Defendants' objections to these conclusions.

## II.    Standard of Review

Summary judgment under Fed. R. Civ. P. 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As our Court of Appeals has succinctly stated, "[a] fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *Adamson v. Multi Community Diversified Serv., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). On summary judgment, "[t]he factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment." *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998). "It is not [the court's] province at the summary judgment stage to weigh the evidence or to make credibility

determinations." *Sanders v. Southwestern Bell Telephone, L.P.*, 544 F.3d 1101, 1105-06 (10th Cir. 2008). "[T]he movant for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Thomas v. Avis Rent a Car*, 408 F. App'x 145, 151 (10th Cir. 2011) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998)). It is only after this initial burden is satisfied that the burden of responding shifts to the non-movant. *Id.* "[T]he nonmovant is not required to rebut an insufficient showing." *Giannullo v. City of New York*, 322 F.3d 139 (2d Cir. 2003).

### III.    Analysis

The Prison Litigation Reform Act ("PLRA") mandates that "[n]o action . . . with respect to prison conditions" under § 1983 may be brought "by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Because Plaintiff was incarcerated at the time he filed the present action, there is no dispute that this exhaustion requirement applies to Plaintiff's claims. *Norton v. The City of Marietta, Okla.*, 432 F.3d 1145, 1150-51 (10th Cir. 2005). It is important to remember, however, that "failure to exhaust is an affirmative defense under the PLRA." *Roberts v. Barreras*, 484 F.3d 1236, 1240 (10th Cir. 2007). Thus, "the burden of proof for the exhaustion of administrative remedies . . . lies with the defendant." *Id.* at 1241.

### A.  The Import of Plaintiff's Failure to File any Grievances

The gravamen of Defendants' objection to the PFRD is their contention that Plaintiff's failure to file any grievance regarding the incidents discussed in the complaint automatically bars Plaintiff's § 1983 claims. They repeat this argument several times, phrasing it with increasing force:

> At the end of the day, the crucial fact is that Plaintiff did not file a single grievance
> related to the issues raised in his Complaint, whether he was at MDC, IAH, Torrance

County Detention Facility, Roswell Correctional Facility, or any other DOC facility. As Plaintiff has remained in continuous custody from the filing of suit to the present day and failed to file any grievances on the pending issues, this lawsuit must be dismissed. . . . The issue of whether Plaintiff could have "re-filed" a grievance at MDC following his stay at IAH, however, may not even be a critical factor. Instead, the crucial undisputed fact remains that Plaintiff **did not engage any facility's grievance process** regarding his present claims and, therefore, his claims are unexhausted.

*Doc. 13* at 7, 9 (internal citation omitted). Defendants' argument fundamentally misconstrues the PLRA exhaustion requirement. The PLRA does not require inmates to brainstorm conceivable remedies and pursue every theoretical avenue of relief; it only requires them to exhaust the remedies that are made "available" to them. 42 U.S.C. § 1997e(a); *Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54 (2d Cir. 2015) ("[T]he PLRA does not require the exhaustion of all administrative remedies, but only those that are 'available' to the inmate."); *Tuckel v. Grover*, 660 F.3d 1249, 1252 (10th Cir. Colo. 2011) ("[I]f an administrative remedy is not available, then an inmate cannot be required to exhaust it."); *Lee v. Benuelos*, 595 F. App'x 743, 747 (10th Cir. 2014) (unpublished) ("[A]lthough exhaustion is a prerequisite to filing suit in federal court, inmates are only required to exhaust available administrative remedies.").

When determining what remedies are "available" within the meaning of the PLRA, courts look to the administrative remedies created by the jail or institute in question. *Woodford v. Ngo*, 548 U.S. 81, 95 (2006) (holding that the PLRA requires prisoners to file grievances in the place, and at the time, the prison's administrative rules require); *Ross v. County of Bernalillo*, 365 F.3d 1181, 1186 (10th Cir.2004) ("Once a prisoner has won all the relief that is available under the institution's administrative procedures, his administrative remedies are exhausted.") (emphasis added); *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) (explaining that "the PLRA does not enable judges . . . to prescribe or oversee prison grievance systems," and agreeing that a prison's "failure to respond to a grievance within the time limits contained in the

grievance policy renders an administrative remedy unavailable" when this response is necessary for the prisoner to complete his appeal). In other words, the PLRA requires inmates to exhaust those remedies the incarcerating agency (or agencies) offers to detainees. If a prison does not offer any procedures for complaining about prison conditions, the PLRA's exhaustion requirement has no effect.

Similarly, if a prison establishes a grievance process that only permits the filing of complaints on certain topics, no remedy is available to the prisoner with regard to unlisted topics and PLRA exhaustion is not required with regard to these topics *See Tuckel*, 660 F.3d at 1252 (as used in the PLRA, "available" means "capable of use for the accomplishment of a purpose"). For example, if a prison provides a grievance procedure for inmate complaints about medical care, but not about the provision of religious services, the PLRA does not require an inmate who seeks access to religious services to first pursue administrative relief through a completely ineffective grievance process. *Snider v. Melindez*, 199 F.3d 108, 114 (2d Cir. 1999) (noting that the PLRA "does not require a prisoner to exhaust . . . administrative remedies that do not address the subject matter of his complaint."); *Roberts v. Jones*, No. CIV-11-143, 2012 U.S. Dist. LEXIS 45106, at *15 (W.D. Okla. Feb. 29, 2012) (holding that Defendant "failed to satisfy his burden of demonstrating an available administrative remedy to contest imposition of a grievance restriction or punishment for disrespect to staff" because he did not provide the Court with the portions of the grievance procedures that stated what matters were grievable). As the above cases unmistakably demonstrate, an inmate's failure to file a grievance regarding a particular incident is not ipso facto proof that this inmate has failed to exhaust administrative remedies under the PLRA. The PLRA exhaustion requirement is bounded by the terms of the incarcerating agency's own procedures.

Defendants' misunderstanding of this central tenant of the PLRA appears to stem from an inaccurate reading of *Booth v. Churner*, 532 U.S. 731 (2001). In *Booth*, the Supreme Court held that a prisoner seeking monetary damages is not excused from the PLRA's exhaustion requirement merely because his prison never grants money awards through the grievance process. *Id.* at 723. In so holding, the Court made clear that administrative exhaustion is not required if the facility's procedures do not authorize prison officials to take any relief with regard to the complaint. *Id.* at 736 n. 4 ("Without the possibility of some relief, the administrative officers would presumably have no authority to act on the subject of the complaint, leaving the inmate with nothing to exhaust."). The Tenth Circuit has summarized the *Booth* holding as follows: "[e]ven where the 'available' remedies would appear to be futile at providing the kind of remedy sought, the prisoner must exhaust the administrative remedies available." *Jernigan*, 304 F.3d at 1032. But, it has elsewhere clarified that the PLRA does not require pursuit of administrative action, where no possibility of *any type of relief* exists.

> [P]risoners need not engage in entirely fruitless exercises when no form of relief is available at all. Without the possibility of some relief, the administrative officers would presumably have no authority to act on the subject of the complaint, leaving the inmate with nothing to exhaust. In other words, the modifier 'available' in the PLRA means that inmates must exhaust administrative remedies so long as there is the possibility of at least some kind of relief.

*Ross*, 365 F.3d at 1187 (internal citations omitted). The Tenth Circuit's position on this issue is consistent with that of the other circuits. *See*, *e.g.*, *Brown v. Valoff*, 422 F.3d 926, 936 (9th Cir. 2005) (once a prisoner has reached the point in an appeals process where the prison explains that no other relief is available, the prisoner has exhausted all available remedies; the PLRA does not require this prisoner to "continue to make appeals to administrators who will not read or consider them"); *Giano v. Goord*, 380 F.3d 670, 678 (2d Cir. 2004) (holding that a prisoner's civil rights suit was not barred by his failure to file a grievance because he reasonably believed that he

"could not pursue matters relating to disciplinary proceedings through the Inmate Grievance Procedure"). Like in these cases, whether Plaintiff's claims should be dismissed as procedurally barred depends on whether he ignored procedures that were actually made available to him for complaining about the February 14, 2014 bus trip.

### B.  The Availability of MDC Grievance Procedures

As previously stated, Judge Yarbrough reasoned that Plaintiff did not have an opportunity to file a grievance with MDC regarding the February 14, 2014 bus trip because Plaintiff did not have access to the Request Manager in the ten-day period following the trip and Plaintiff's time for filing a grievance had expired before his brief overnight return MDC. *Doc. 12* at 5-6. While Defendants have, as a general matter, objected to this finding, they do not dispute that Plaintiff lacked physical access to the MDC Request Manager in the roughly one and a half month period following the alleged violation of Plaintiff's constitutional rights. This is unsurprising; the evidence submitted to the Court irrefutably shows that Plaintiff's transfer to IAH and TCD prevented him from filing a grievance directly with MDC through the Request Manager during this time period.

Nor do Defendants dispute that filing a grievance within ten days using the Request Manager is the one and only method for submitting grievances available to MDC-detainees according to the terms of the written MDC grievance policy. Because Plaintiff could not comply with these terms, it follows that there were no MDC grievance procedures available for him to exhaust. Defendants attempt to avoid this conclusion by arguing that Plaintiff could have filed an untimely grievance at MDC upon his return. To support this argument, Defendants cite to the affidavit of Phil Quintana, MDC's Social Services Coordinator. In his affidavit, Mr. Quintana testifies that "[i]n [his] experience, a detainee who files a grievance while being housed or

detained at a separate facility can also 're-file' that grievance at MDC once they are returned to MDC, and MDC will process it just as if the grievance had been originally filed at MDC." *Doc. 7*, Ex. F ¶ 22. Significantly, Mr. Quintana's statement suggests that MDC would only consider an untimely grievance if the detainee had filed a grievance about the incident while being housed at another facility. Thus, even this unofficial practice depends on an inmate's ability to file a grievance while housed at another facility. The Court, however, will temporarily set aside the issue of whether Plaintiff had the ability to file a grievance at IAH.

In either case, MDC's written policy does not inform inmates that they can file untimely grievances regarding events that occurred prior to their transfer to another facility. This is a critical fact that Defendants ignore. For the purposes of the PLRA, the only grievance procedures that must be exhausted are those that are available to inmates (*i.e.* those that are communicated or otherwise provided to inmates). Here, MDC policy tells detainees that incidents become "non-grievable" if they are not challenged within ten days. While MDC is free to disregard its procedures and consider late grievances, the PLRA does not allow MDC to create an underground system for considering late grievances, which prisoners must divine if they do not want to lose access to the courts. The law is well-settled that prisoners "need not engage in entirely fruitless exercises when no form of relief is available at all." *Ross*, 365 F.3d at 1187. Defendants have not presented any evidence that would suggest Plaintiff should have known MDC would consider a grievance filed upon his return even though this grievance would be filed after MDC's published deadline. The Court, therefore, cannot conclude that the MDC procedures were available to Plaintiff for complaining about the February 14, 2014 bus trip. To hold otherwise would encourage prisoners to misuse prison grievance procedures and file frivolous grievances ignoring time, place, and manner restrictions in order to ensure that they avail

themselves of any unofficial, unwritten policies and thereby preserve their right to sue under the PLRA.

In the PFRD, Magistrate Judge Yarbrough also expressed concern about whether Plaintiff had access to the MDC Request Manager during this overnight layover at MDC. *Doc. 12* at 6. Defendants responded with new evidence: Plaintiff's cell history (*Doc. 13*, Ex. AA) and an affidavit explaining that the computer kiosk housing the MDC Request Manager is located in "the general population pod area," (*Doc. 13*, Ex. W ¶ 10). Defendants claim that this evidence shows Plaintiff had access to the computer kiosk when he returned to MDC. Plaintiff did not respond to Defendants' objection and has not disputed Defendants' assertion about his ability to access Request Manager on March 25, 2014 through March 26, 2014. As a result, the Court will not issue any findings regarding Plaintiff's access to the Request Manager. [3] For the reasons discussed above, Plaintiff's physical ability to file a grievance with MDC in March 2014 is not dispositive to the outcome of this case. Whether Plaintiff had access to the Request Manager or not, Plaintiff had no reason to go the computer kiosk and create a grievance regarding the February 14, 2014 bus trip, because any such grievance would have been untimely.

---

[3] The Court notes that the evidence Defendants have provided on this issue is not airtight. Defendants gave the Court a screen shot of Plaintiff's cell history which indicates that Plaintiff left Torrance County at 21:25 on March 25, 2014. *Doc. 13*, Ex. AA. He was then transferred to MDC, "E Unit Pod 3," Cell Number 21 from March 25, 2014 at 21:25 to March 26, 2014 at 5:26. From March 26, 2014 at 5:26 to March 26, 2014 at 10:58, Plaintiff was placed in the RDT Unit, with an unassigned cell block and cell number. Plaintiff's two MDC assignments are classified as "general population." *Id.* In light of this classification, Defendants assume Plaintiff had access to Request Manager, which was located "in the general population pod area." *Doc. 13*, Ex. W ¶ 10. While evidence of record does not contradict this assumption, neither does it irrefutably show that Plaintiff had actual physical access to the computer kiosk during his less than fourteen hour, overnight stay at MDC. The cell entries reflect custody and assignment changes, but do not account for Plaintiff's exact physical location. Notably, the entries do not account for travel or processing time (Plaintiff is listed as leaving TCD and arriving at MDC at the exact same time, even though they are not located in the same county). Nor do these entries provide any information about if, or when, Plaintiff's movement was otherwise restricted (for example, if the cells are locked down at night).

### C.  The Availability of IAH Grievance Procedures

IAH allows inmates to initiate grievances for, among other things, "an alleged violation of civil, constitutional or statutory rights and policy." *Doc. 11*, Ex. L. Whether these procedures were available to Plaintiff for complaining about the conduct of MDC staff during the February 14, 2014 bus trip depends on whether these procedures contemplate and permit the filing of grievances about the conduct of prison officials who are not affiliated with IAH. The Court agrees with Judge Yarbrough that a reasonable jury could conclude that the procedures did not cover such complaints. Admittedly, the language of the IAH procedures is incredibly broad and could be construed to authorize the filing of complaints about outside parties. However, this is not the best or most reasonable way to read the IAH grievance policy. For example, although the IAH procedures purport to allow inmates to file grievances about any violation of their constitutional rights, common sense suggests that this does not include grievances committed by third-parties prior to an inmate's incarceration (e.g. a voting rights violation that occurred the day before an inmate was arrested). To avoid this obviously unintended result, one could read the IAH policy as containing an implicit limitation that all grievances must relate to conditions at IAH.

This interpretation of the IAH policy cannot be rejected at this stage in the proceedings where Defendants bear the burden of proof and all inferences must be drawn in favor of Plaintiff. *Riser v. QEP Energy*, 776 F.3d 1191, 1198 (10th Cir. 2015) (to be entitled to summary judgment on an affirmative defense, the defendant must proof this defense "so clearly that no rational jury could find to the contrary"); *Kramer v. Wasatch County Sheriff's Office*, 743 F.3d 726, 747 (10th Cir. 2014) (summary judgment on an affirmative defense cannot be entered unless the "defendant has supported its motion with evidence that would entitle it to a directed verdict if not

controverted at trial") (internal citation omitted). This is especially true because the evidence Defendants have provided suggests that IAH staff understood their own grievance procedures as lacking a mechanism for entertaining grievances from MDC detainees regarding the conduct of MDC officials. *See Doc. 11*, Ex. M at 2 (when an MDC detainee filed a grievance about being brought to IAH against his will, IAH staff responded that this detainee needed to take the matter up with New Mexico.).

Defendants disagree with this characterization of the evidence. They contend that the IAH grievances procedures were available to Plaintiff because "at least one New Mexico detainee with an issue similar to one brought in this lawsuit by Plaintiff engaged the IAH grievance procedures." *Doc. 13* at 5-6. While this argument has some persuasive value, it does not establish, as a matter of law, that IAH's grievances were available to Plaintiff. Just because one inmate filed a grievance regarding a similar matter does not mean that the IAH grievance procedures are best interpreted to permit such grievances. Here, evidence exists that IAH (like TCD and DOC) limited its grievance procedures to the filing of grievances regarding conditions at IAH. This evidence precludes the Court from entering summary judgment in Defendants' favor.

### D.  The Availability of TCD and DOC Grievance Procedures

In their objections, Defendants do not discuss the grievance procedures of TCD or DOC. The evidence Defendants have submitted to the Court, however, unquestionably shows that neither TCD nor DOC permits inmates to file grievances regarding the conduct of third-parties. Thus, there can be no dispute that the grievance procedures at these facilities were never available to Plaintiff for seeking relief regarding the conduct of MDC during the February 14, 2014 bus trip.

**IT IS THEREFORE ORDERED THAT:**

1.  The Magistrate Judge's Proposed Findings and Recommended Disposition (*Doc. 12*)

    is ADOPTED.

2.  Defendants' Motion for Summary Judgment (*Doc. 7*) is DENIED.


_____
UNITED STATES DISTRICT JUDGE